EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **PAUL A. WHITE and JAMES SHAW** individually and on behalf of all others similarly situated, | § § § § | Docket No. 4:18-cv-01983 |
| Plaintiffs, | § § | |
| v. | § § | JURY TRIAL DEMANDED |
| **KSW OILFIELD RENTAL, LLC; AND DUPRE ENERGY SERVICES, LLC** | § § § § | COLLECTIVE ACTION 29 U.S.C. § 216(b) |
| Defendant. | § § | |

## DECLARATION OF PAUL A. WHITE

I, Paul A. White, hereby declare as follows:

1. My name is Paul White and the facts contained in this declaration are within my personal knowledge and are true and correct.

2. I worked for KSW Oilfield Rental, LLC and Dupre Energy Services, LLC ("Defendants") as a Solids Control Technician or "Solids Control Consultant" within the past three years of the date I filed the lawsuit and was classified as an independent contractor.

3. During this timeframe, I only worked for Defendants and was financially dependent on Defendants.

4. While I was classified as an independent contractor, Defendants scheduled the days and hours that I worked, provided me with the necessary equipment to perform my job duties, instructed me on how to perform my job duties, required me to comply with Defendants company policies, and supervised my performance.

5. While working for Defendants, I was paid a day-rate for each day that I worked. Defendants dictated the days that I worked, which was non-negotiable or "take it, or leave it."

6. I never received any guaranteed amount of money for the weeks that I worked. I was never paid for days that I did not work and I was never paid on a salary-basis.

7. While on location I was on call 24-hours a day. I was typically scheduled to work a 12-hour shift. Defendants required me to live in a trailer (that it paid for) that was on or near the jobsite. Based on my experience with Defendants, my observations on location, and my conversations with co-workers, this schedule was typical of all of Defendants' day-rate Solids Control Consultants.

8. Although I regularly worked in excess of 40 hours a week, I never received any overtime pay. Based on my experience with Defendants, my observations on location, and my conversations with

co-workers, all of Defendants' Solids Control Consultants regularly worked more than 40 hours each week without receiving overtime compensation.

9.      Based on my experience with Defendants, my observations on location, and my conversations with co-workers, I believe that Defendants' failure to pay individuals who received a day-rate any overtime was its standard pay practice.

10.     As a Solids Control Consultant for Defendants, my primary job duties (and the primary job duties of all of the Solids Control Consultants) included ensuring that all equipment and systems were being operated to Defendants' standards; operating, monitoring and controlling process levels, temperatures, pressures and flows for applicable processes and systems according to predetermined parameters in a safe and efficient manner; ensuring that required documentation is legible, accurate and completed on a timely basis; and regularly attending and actively participating in safety meetings. Safety meeting were typically lasted 30 minutes and took place before and after each shift. We were also responsible for operations and maintenance of solids/waste management equipment and heavy equipment. Of course, we were also responsible for setting up, tearing down, monitoring and maintaining centrifuges and related equipment and completing the relevant paperwork.

11.     Based on my experience with Defendants, my observations on location, and my conversations with co-workers, I believe that all of Defendants' day-rate Solids Control Consultants reported directly to Defendants supervisors.

12.     I was not required to have any advanced degree to work as a Solids Control Consultant for Defendants. Based on my experience with Defendants, my observations on location, and my conversations with co-workers, I have personal knowledge that many of Defendants' day-rate workers did not have any college degree.

13.     Based on my experience with Defendants, my observations on location, and my conversations with co-workers, Defendants did not require me or any of the other day-rate workers to significantly invest financially in our jobs. For example, Defendants provided me with the costly equipment necessary to perform my job duties as well as certain pieces of personal protective equipment (PPE). My investment was limited to the few pieces of PPE that Defendants did not provide.

14.     As a day-rate worker, I did not have any authority to hire, fire, or discipline anyone on location or other Defendants employees/advisors. Management-level employees of Defendants or its clients were the only persons able to do this. I did not make any hiring, firing, advancement, or demotion recommendations while employed by Defendants. Based on my experience with Defendants, my observations on location, and my conversations with co-workers, I do not believe that any Defendants day-rate workers had any authority to hire, fire, or discipline anyone on location or other Defendants employees/advisors.

15.     I was also not allowed to "sub-contract out" my job assignment to another worker.

16.     Defendants required all of its Solids Control Consultants to adhere to strict guidelines, expectations, and directives. We did not have any independent judgment or discretion to create or stray away from established policies, practices, or regulations.

17.     I have spoken with several former co-workers who worked for Defendants as Solids Control Consultants and received a day-rate and know that there is a general interest in recovering the back wages that we are entitled to through this collective action. Based on these conversations, I believe

2

that other workers would be interested to learn about their rights and their opportunity to join this lawsuit.

18.     Because we work in remote locations that are far away from home for long periods of time, we will eat, sleep, and work in trailers at the jobsite. This work schedule makes it difficult for us to regularly receive mail. Therefore, I believe that in addition to receiving a letter notice, sending an email notice and posting a notice at the jobsites will guarantee that the other Defendants day-rate workers will be made aware of the case.

19.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed on **Sep 12, 2018**.

_____
Paul White (Sep 12, 2018)

Paul White